Thank you, Your Honor. My name is C. K. Lee, and I represent the plaintiff's appellants on this matter. Given that this is the last oral argument for the first session, I think the court would be pleased to know that I think the facts in this case are actually very easy to determine. You know, the appeal is based on an improperly decided motion to dismiss, and the four corners of the complaint, I think, makes it very clear that there are certain factual disputes that need to proceed as opposed to the court unilaterally deciding the case as a matter of law. Now, what is this case about? This case is actually a very easy case about a misrepresentation. So the defendants in this case, the appellees, they made affirmations on their labels, on both the front label and also on the ingredient list. Well, why isn't your case preempted by federal law? Sure. There's a case in California that actually addresses that exact issue, the case Tran v. Sioux Honey Association Co-op. It's a 2018 U.S. District Lexus 146380, and the FDA has made certain promulgations, but it's never addressed the issue about the percentage of the purity of honey. So, you know, and the decision from the Tran matter, the court held that the crux of Tran's claims is Sioux's honey use of the words pure 100% on his product labels, not Sioux Honey's failure to disclose the presence of glyphosate in its honey. As noted above, Sioux Honey fails to identify any federal requirement that would be impossible to comply with should Tran prevail and Sioux Honey be required to remove the name pure. Nor does Sioux Honey show how such a requirement would stand as an obstacle to the accomplishment and execution of the purpose of the objectives of Congress. So similarly here, the FDA had provided certain guidance which allowed for honey manufacturers to state what type of honey it is. So, for example, in the FDA's guidance for the honey industry and number three of their Q&A, they state that manufacturers can state the chief floral source of the honey, but more importantly, they go on and state any claims about the floral source of the honey must be truthful and not misleading. So, you know, if they can state the primary source, then why isn't it okay to call it Manuka honey? Maybe there's an issue about the 100%, but just if you can state the primary source and that's what this is, why isn't that sufficient under the federal guidance? Sure. Thank you, Your Honor. They can absolutely say that the product is Manuka honey, but the problem is their label says 100% Manuka honey. And so that's on the front label and then on the back label, they have an ingredient list which states Manuka honey. I understand there's a difference. They claim that some of the plaintiffs, the California plaintiff claims 100% and the other ones don't. So are you conceding that it's only the 100% that's at issue? I'm not conceding that, Your Honor. Explain to me why Manuka honey by itself without 100% is a problem. If it's if it's on the front label and not part of the ingredient list, that is not a problem because... All right. If it's on the front label, why is it a problem having it on the ingredient list if the federal guidance says if that's the primary floral source, then that's sufficient? Oh, sure. Thank you, Your Honor. So I think if we look at number two of the FDA's guidance for honey manufacturers, they state if a food contains only honey, the food must be named honey. And I think we're all in agreement that's fine. But then they also go on to note, please note that this answer pertains solely to how you name your product. It only goes to how they name the product. Other labeling requirements, ergo net weight, nutrition facts, et cetera, apply to the product. So my understanding and interpretation of this is that they don't necessarily have to have an ingredient list. But if they do have an ingredient list, then they should include what is in the ingredients. And so we had done an analysis using pollen count to test and gauge the purity of the honey that was being sold. And it came out to be approximately 60 percent. There's other types of clover or golden blossom, other types of honey that's been adulterated into that product. And because they chose to actually include it in the ingredient list, their ingredient list needs to be accurate. They didn't have to put it in the ingredient list, but once they do, they're obligated to. And then I'm quoting the FDA again. Any claims about the floral source must be truthful and not misleading. So when they put in an ingredient list that only says Manuka honey, then that is misleading, especially coupled with their front label representation of 100 percent. So for all these reasons, we believe that the lower court was in error. Now, I want to address an issue regarding adulteration because of the lower court. So would you explain how the UMF rating system impacts the representation? As I understand it, Trader Joe's also gives itself on its label a lower rating for purity under that standard, which somehow is in conflict with the 100 percent number. Yes, thank you, Honor. So just to clarify, Manuka honey is a very scarce and valuable resource. You know, I would liken it to, let's say, truffles or deep sea pearls. You know, it's something that's naturally occurring, which, depending on the native terroir of the landscape, it's very hard to obtain. And so that's why it's priced at a premium. And because it's priced at a premium, what the industry has done is get together to get a UMF certification. So if you were a honey manufacturer, you could send in your honey, get it certified, and they would have a UMF certification that would be accurate. Here, they've actually never done that. The number 10 plus on their label is actually another misrepresentation because it looks like a UMF certification, but it actually is not. And so that just supports the claimant's position that the label is misleading and it's misguided. And that's why we think the lower court should be overturned. Can I ask you a question about jurisdiction? Because you filed your notice of appeal a day late and you were granted permission to do so based on excusable neglect. And the excusable neglect consisted of the following. Because Mr. Lee was out all day for depositions, I thought I could wait until July 25th, the next day. My error was due to June being a 30-day month, and therefore I thought that there was an extra day for filing. I don't understand how that's conceivably excusable neglect. I could see if June had 31 days and you thought it was 30, but I don't see how anything justifies in those two sentences having filed this late. If this isn't inexcusable, I'm not sure I know what is. I guess my only explanation would be that I'm the sole partner of a firm that before the pandemic had 30 people. I had given instructions to my paralegal to file the papers. For some reason, he did not. It's ultimately all my fault and all my problem. I was grateful that the lower court allowed the appeal to proceed. But unfortunately, the facts are what they are, and I defer to the court's guidance on it. We have a very famous en banc decision on that. This very question of whether this kind of miscalculation of the filing deadline is excusable neglect. A very well-known, high-profile law firm had instructed their paralegal to file the notice of appeal, and they miscalculated the date. A mistake. And the three-judge panel on which I sat said it was inexcusable. It went en banc, and the en banc court said it was excusable neglect. There was a very loud dissent by Judge Kaczynski, saying exactly what Judge Collins just said. I understood. Are you confident with that case? Yeah, if I could, that would be great. I don't have confidence in the case right now. I didn't realize this issue was coming up. Yeah. Since we can raise jurisdiction sua sponte, I know it hasn't been raised, but it's the one issue that we're obligated to raise sua sponte. You can submit something on that if the presiding judge thinks that's appropriate. But it is something we can't overlook if we catch it, and I did catch it. Thank you, Your Honor. So why don't you research that case? It's an en banc decision maybe a decade ago. Okay, thank you. I definitely will, and then I will submit a supplement to the court. Yeah, that case doesn't eliminate the excusable neglect standard. It has a permissive reading of it, but it still has limits. It has an expansive reading of it. Understood. Thank you. I'd like to reserve my remaining time for a rebuttal. All right. Thank you very much. Yeah, I'm just going to restart my video, and it'll just take a second to hopefully focus it better for you. Yes, it seems rather unfocused. Oh. There. Is that better? Okay. Good morning. May it please the court. My name is Dawn Sestito, and I represent Trader Joe's Company. So the theories in this case are based on the pollen test that are attached to the first amended complaint. Those are excerpts of record 258 and 259. And what the plaintiff tested was pollen counts, not honey content. And if you look at those tests, manuka pollen is far and away the most prevalent, making up 60% of the detected pollen. And the next most prevalent pollens are 10% or less, meaning that manuka is undisputedly the chief floral source of the honey. And plaintiffs don't dispute that the honey is harvested entirely from wild plants in New Zealand. So they don't contend that we mixed in non-New Zealand honey or that we added any substance that's not honey. And they've never plausibly alleged that we diluted the manuka honey with non-manuka honey. Their arguments all go to the pollen content. But all of that suggests that calling it manuka honey would be fine. But why add 100%? 60% is the pollen count. Couldn't consumers reasonably think that if it's 100%, that 100% means that that's what the percentage is? Well, they could think that it's 100%. So first of all, the label is 100% New Zealand manuka honey. So it's 100% from New Zealand. It's 100% honey. And it's also 100% manuka honey under the FDA honey labeling guidance. Because what that tells us is that, you know, we know that bees don't forage exclusively on one type of flower. So single source honeys are named for their chief floral source pursuant to that policy. And so honey that's produced by bees that forage mostly on one type of flower is called orange blossom or clover or manuka. And since that's what the honey is, separate from the pollen content, it is all manuka honey. We never represented anything on the label about the pollen count, about the pollen content. What we said was that it's 100% New Zealand manuka honey. And under the guidance, that is exactly what it is. They're not contending that we took two different kinds of honey and put them together. They're not contending that this honey was made in any way other than a normal process involving bees in New Zealand that forage in the wild. And so if it's not all manuka honey, I'm not sure what else it is if it's not all manuka honey, even though it, of course, includes pollen from other flowers, as all honey does. All honey includes pollen from other flowers. So suppose there were guidance that said, you know, and I'm just making this up, that if ground beef is 75% sirloin, then that's sufficient to label it sirloin. But you then put 100% sirloin, you'd agree that that would be misleading because a consumer would think they're getting all sirloin as opposed to 75%. Why doesn't that analogy work here? Because this is the natural product. We're not choosing which part of the cattle to grind into a ground beef product. This is a product that is naturally occurring. And so the FDA has to decide what we can call it. And what they've determined is that if the chief oral source comes from manuka, what that product is, is manuka honey. That is the common and usual name. And the common and usual name is supposed to plainly and simply describe what the product is. And you're allowed to use that both for the product name and also you're required to use it for the product name and you're required to use it in the ingredient statement as well. And so there would be nothing else we could list in the ingredient statement that would conflict with the FDA guidance. But there's nothing that says you have to call it 100%. That's correct. That's right. The rules don't require us to call it 100%. But they define the product as manuka honey. And so if it's all manuka honey, then it's accurate to say that it's 100% New Zealand manuka honey because it's both all 100% from New Zealand. It's 100% honey. It's not mixed with a sweetener. And under the honey labeling guidance, they consider it to be manuka honey because of the chief oral source. And I don't think a reasonable consumer would assume that that has any implications for pollen count when pollen is not mentioned on the label. But what about the intersection of this year F number that Trader Joe's also puts on the label that it's 10%? But yes, so the UMF number, the UMF is actually measuring something different. It's not measuring pollen count. It is measuring certain active ingredients within the honey. So it's a different way to confirm whether honey is manuka and to grade it. And the scale goes from, I think, 5 to 26. And this had a 10 plus on it, which for a person who is familiar with manuka honey, they would understand that that is a less potent manuka honey than one that was graded much higher or one that cost significantly more. So there's also the allegation in the first submitted complaint of a manuka honey with more than 90% manuka pollen count. That's an excerpt of record 222. And that product sold for over $250. And that's in stark comparison to the 1399 product that was sold at Trader Joe's. So that's another reason why a reasonable consumer would not conflate honey with pollen and think that this product was 100% manuka pollen. The plaintiffs also admit in their pleadings that it's impossible to direct bees to forage on only one type of flower. That's an excerpt of record 219. One case has found that consumers don't even know that honey contains pollen. That's Ross v. Sioux Honey Association, 213 Westlaw 146367. And here the plaintiffs allege that reasonable consumers know that manuka pollen counts vary from brand to brand. But as I said, the example they gave of that was one with a very high pollen count that cost 20 times as much as the Trader Joe's product. And the Second Circuit had held in a case involving truffles, actually, because Mr. Lee likened this product to truffles, that a reasonable consumer would not assume in that case that a truffle oil contained real truffles, the most expensive ingredient in the world, at a lower price. So here, similarly, a reasonable consumer would not expect this product to contain the same pollen content as a manuka honey that costs 20 times the price. So in our reasonable consumer analysis, do we look at the reasonable consumer of manuka honey, or reasonable consumers in general, because perhaps the reasonable consumer of manuka honey would understand that a $13 jar of manuka honey didn't have the same pollen count as the $299 jar? Yes, so I think for specialized products, I think you are permitted to look at a reasonable consumer for a specialized product. And I agree that a consumer that is familiar with manuka honey would certainly not have thought this was 100% manuka pollen. I think they would have understood that that's not possible. But I think even if you look at a reasonable consumer who was less familiar with manuka honey, I don't think they would have been thinking about the pollen count at all. That wouldn't have been something they were considering, and certainly, especially because the product doesn't make any representations about pollen count. And if you compare this case to Becerra, for example, in that case, that was the Diet Dr. Pepper case, the plaintiffs there alleged, the question was what a reasonable consumer would think the word diet meant. And they proffered things like a dictionary definition or a consumer survey. And here, nothing has been proffered. It's just the kind of fair argument that a consumer would assume that there is 100% manuka pollen, when that's not actually even possible in nature. So the fact that the container doesn't reference pollen, you can't have 100% pollen, products that have very high pollen counts cost significantly more money, we think shows that the district court was correct in terms of dismissing the claims. I can talk maybe a little about preemption as well, which really goes to the ingredient statement. And what the FDA honey labeling guidance there says is that products, the statutes say that products have to be labeled according to their common and usual name. That's 21 USC 343 I2 and 21 CFR 1014 A1. And under the honey labeling guidance, the common and usual name is honey or manuka honey. And so because that is the common and usual name, that is what we can refer to the product as, that is all of what's in there. And if it's not 100% manuka honey, or if that is not the sole ingredient, I don't know what else we would put on the label because calling it at various points, the plaintiffs have suggested we should call it a manuka honey blend, but that would be misleading and contrary to the FDA honey guidance, because that would suggest that it's mixed with a different honey or that there's a sweetener mixed in. I don't know what else we could put on the label. We're not, we don't say anything about pollen. We're not required to put pollen content counts on there. What we're required to call it is the common and usual name. And that is expressly permitted by the FDA to be called manuka honey. The plaintiffs, you know, in their briefs, argue that the common and usual name is different for the ingredient statement than for the product. They don't provide any authority for that. And that proposition doesn't make sense because the regulations, in fact, are looking for consistency in the common and usual name. They want it to be this uniform across similar products. So it wouldn't make sense to have one common and usual name that's permitted on the front of the label and a different one that's permitted on the back of the label. And so calling the product, you know, the items that the plaintiff has proposed, like a manuka-based blend, or listing all of the different pollen sources in the ingredient statement, would conflict both with the FDA guidance. It would upend how honey is labeled. And it would actually be more confusing to consumers who would think something labeled as a blend is a blend of honeys or a blend of honey with a sweetener. And the other alternative that the plaintiff proposed was just calling it honey. But again, consumers frequently want to know what the cheap oral source of the honey is because the different honeys have different characteristics in terms of taste and texture, viscosity, aroma, as well as other qualities. Are there other similar honeys that you can think of that are out there that are labeled similarly? Well, I think honey is very frequently labeled with regard to its cheap oral source. I think it's very common to go into a store and see orange blossom honey or clover honey. And it's quite clear under the FDA labeling guidelines that that honey is not 100% orange blossom, doesn't have 100% orange blossom pollen or 100% clover pollen. Here, in terms of a label that said 100% New Zealand manuka honey, another reason why that type of representation might be important to individuals is in the honey guidance question 10, which is at ER 325, the FDA talks about concerns about honey that's been adulterated. And when they're talking about adulteration, they're talking about honey that's adulterated with a sweetener. And it specifically references an import alert for the surveillance of honey that's been adulterated with cane or corn sugars. And there's a link in there that includes New Zealand on that list. So it is actually an issue that's of great importance to the FDA and to consumers to ensure that honey products are labeled clearly as 100%, that labels aren't misbranded representing something as honey when it has a sweetener. And so the 100% here was also important to convey that the honey all came from New Zealand and that it was all honey, that there were no sweeteners included in it. And if you look, in fact, at the guidance overall, the primary concern in the guidance is to assess the, to make sure that consumers aren't getting misled into buying a product that blends honey with a sweetener. We certainly don't have that issue here. A couple of other very quick things, because I see my time is running out. Mr. Lee raised adulteration in his opening comments. Adulteration has been completely waived. That was an argument that was made below that was not addressed in the briefs. And the argument below, as he clarified at the hearing before the district court, was that the bees adulterated, you know, the bees went to different flowers. And so the honey was adulterated in the hive. That's not what adulteration means. And then, of course, on the jurisdictional issue, the court can consider that sua sponte. And if the court would like briefing on that, we'd be happy to submit a brief as well. So thank you. Mr. Lee, you had some time left. Thank you. I just wanted to address the two things regarding the consumer and the adulteration issue. It seems that we've lost Judge Eaton. I'm sorry? We've lost Judge Eaton, I think. Sam, are you there? Have we lost Judge Eaton? Hi. I'm on the phone with Judge Eaton's clerks right now, trying to find out if he's on his way back. But it seems he's having a technical problem with his iPad. Wow. We've had a lot of technical problems today. Yes. I do think we should ask the parties to provide letter briefs, not to exceed five pages, double spaced, on the question of whether or not we have jurisdiction over this case. And I remembered the name of the online case I was thinking of. It's called P. K. B. Andrews, P-I-N-C-A-Y, B. Andrews, on that question of excusable neglect and what constitutes excusable neglect. And we should submit them no later than a week from today, so that we have some time on consideration. Does that sound good to you, Judge Collins? Oh, that sounds fine. Thank you. Thank you. The site for that P. K. case, by the way, is 389 F. 3rd, 853. You have the site. I have the site. My iPad is working, so. Oh. I'm sorry, Judge. It was 389 F. 3rd, and I didn't get the rest. It's 389 F. 3rd, 853. You have made all your arguments in the briefs. We were going to take a ten minute recess at this point anyway, so I suggest we will take everything into consideration. Obviously, this jurisdictional question is very important. And I would suggest that we submit this case for our decision now, even though you're going to receive a couple minutes less. So am I making my final two minute argument, Your Honor, or are we just waiving it? I was going to just leave it. Well, I mean, is there something that you feel the urgent need to say? Yeah, just very quickly, Your Honor. Thank you. Which is in regards to the UMF label, the UMF label is just not relevant here. They were never UMF certified. And also, the main issue really is to think about is, you know, who has the burden of the representations that defendants are providing? Is it the consumer who, when they read the label, have to conduct their own investigation? Or is the onus on the manufacturer to provide a representation regarding the product that would be accurate? So that's really one of the main things I think, you know, we have to consider. In regards to the pollen test, the pollen test absolutely reflects the purity content. Similar to, you know, using a current example, you know, testing for COVID, they're not testing for the presence of virus. They would be testing for the presence of antibodies. You know, when you're testing the purity of honey, you're testing the presence of pollen and not the nectar. And separately, my last point in regards to adulteration, the lower court during oral arguments had discussed, you know, how the type of adulteration that was possible here. And, you know, I for one believe that, you know, how a product is adulterated is actually an issue of fact that should be explored. All we know right now is they represented 100%, and the product that they actually provide is 60%. So drawing some analogies, it would be as if, you know, I work a full week and only got paid, you know, for 60% of it. Now, you can absolutely control the purity of your product. You can control the purity of your product by using a field that has, you know, only when you've got honey flowers. And that's really on the onus of the manufacturer. Thank you very much. More versus Trader Joe's company will be submitted, and we will take a 10-minute recess at this time, and hopefully we will reconnect with them during the meeting.
judges: Wardlaw, Eaton, Collins